IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

ROBERT SWINDELL,

        Plaintiff,

  Vs.

                            No. 12-2008-SAC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


MEMORANDUM AND ORDER

      This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the claimant Robert Swindell's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") and for supplemental security income ("SSI") under Title XVI of the Act. With the administrative record (Dk. 9) and the parties' briefs on file pursuant to D. Kan. Rule 83.7.1 (Dks. 10, 15, and 16), the case is ripe for review and decision.

**STANDARD OF REVIEW**

      The court's standard of review is set forth in 42 U.S.C.§ 405(g), which provides that the commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." The court also reviews "whether the correct legal standards were applied." *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Substantial evidence is that which "a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Persales*, 402 U.S. 389, 401 (1971) (quotation and citation omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The review for substantial evidence "must be based upon the record taken as a whole" while keeping in mind "evidence is not substantial if it is overwhelmed by other evidence in the record." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citations omitted). In its review of "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, . . . [the court] will not reweigh the evidence or substitute . . . [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted).

The court's duty to assess whether substantial evidence exists: "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.'" *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (quoting *Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir. 1985)). At the same time, the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d at 1084 (internal quotation marks and citation omitted). The court will

"meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been made." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted).

By statute, a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The first step entails determining whether the "claimant is presently engaged in substantial gainful activity." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted). The second step requires the claimant to show he suffers from a "severe impairment," that is, any "impairment or combination of impairments which limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (internal quotation marks and regulatory citations omitted). At step three, the claimant

is to show his impairment is equivalent in severity to a listed impairment. *Lax*, 489 F.3d at 1084. "If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work." *Id.* Should the claimant meet his burden at step four, the Commissioner then assumes the burden at step five of showing "that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy" considering the claimant's age, education, and work experience. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010) (internal quotation marks and citation omitted). Substantial evidence must support the Commissioner's showing at step five. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). The evaluation at steps four and five makes use of the agency's RFC assessment. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).

**PROCEDURAL HISTORY**

Following a hearing at which Robert Swindell was represented by counsel, the administrative law judge ("ALJ") issued his decision on November 23, 2010. (R. 9-19). Swindell alleged he has been disabled since May 31, 1993. (R. 9). Preferring to base his adjudication on later steps, the ALJ found at step one that Swindell had not engaged in substantial gainful activity. (R. 11). At step two, the ALJ found Swindell had the severe impairments of asthma and

4

borderline intellectual functioning. *Id*. The ALJ found at step three that Swindell's impairments did not meet or equal a listed impairment. (R. 12-14). The ALJ determined Swindell's RFC and that he could not perform any past relevant work. (R. 14-17). Finding, however, that Swindell could perform jobs that exist in significant numbers in the national economy, the ALJ concluded that he was not disabled. (R. 17-18).

**SUMMARY OF ISSUES**

The ALJ found that Swindell's mental impairments did not meet or equal the listings in 20 C.F.R., Pt. 404, Subpt P, App. 1. The ALJ relied on the state agency psychological consultant's review and impression of IQ testing performed on Swindell for an earlier application. Is there substantial evidence in the record to support the ALJ's finding that Swindell's IQ testing scores were invalid? Did the ALJ rely on evidence not of record in making that finding? Before the hearing closed, Swindell's counsel requested a follow-up consultative examination with WAIS-III testing to determine the extent of Swindell's limited intellectual functioning. Did the ALJ err in not developing a record with this additional examination and testing?

**EVIDENCE OF PRIOR IQ TESTING**

The ALJ's mental impairment findings at step three included the following:

The record does not reveal valid IQ scores for the claimant. However, the State agency psychological consultant noted that, as part of a prior

> claim, the claimant received IQ testing in March of 2007. While complete IQ scores are not included in the record, the State agency psychological consultant noted, regarding the prior IQ testing, "[t]he claimant's motivation appeared to be quite low and this was felt to adversely affect [the IQ] test results." The State agency psychological consultant further stated that , "[w]hile [the claimant] obtained an overall IQ score of only 56, his actual potential appeared higher." The State agency psychological consultant continued that the claimant's IQ test's "validity was questioned due to lack of effort and motivation." (Exhibit 7F, pg. 13). As such, the undersigned finds that there are no valid IQ scores in the record.

(R. 13-14) (underlining added). Exhibit 7F is the psychiatric review technique prepared by the state agency psychological consultant, Lauren Cohen, PhD, on September 21, 2009. Her consultant notes included the following statement:

> As part of a prior claim, IQ testing was completed in March of 2007. The claimant's motivation appeared quite low and this was felt to adversely affect test results. While he obtained an overall IQ score of only 56, his actual potential appeared higher, likely falling at the high end of the EMR range.
> . . . .
> . . . Prior testing resulted in low scores, although validity was questioned due to lack of effort and motivation.

(R. 241). Of note, Dr. Cohen's statement is less than clear, as she could be expressing an opinion, summarizing the opinion of another consultant, or both. Moreover, the administrative record does not include any actual IQ testing results, any data associated with that testing, any report to indicate the test was administered and interpreted by a psychologist or psychiatrist qualified to make this evaluation, or any narrative report from a qualified person that comments on the validity of the scores and consistency of those scores with the claimant's developmental history and degree of functional

limitation.

Swindell argues that the ALJ's finding of an invalid IQ score is not supported by substantial evidence as the record contains only Dr. Cohen's note, as quoted above, without the supporting test results and data or a narrative evaluation of the actual testing data. Dr. Cohen's findings, according to the claimant, offer no "rationale" for her conclusory opinions that "Swindell's IQ appeared higher" and that Swindell's "effort and motivation" was lacking. (Dk. 10, p. 11). Swindell also contends that without this supporting evidence the court is unable to determine whether the ALJ's validity finding is supported by substantial evidence. The Commissioner responds that IQ scores must be valid and that the ALJ properly relied on Dr. Cohen's "findings," "observation" and citation of "evidence" in concluding that the IQ scores were not valid.   In the Commissioner's judgment, the ALJ did not consider any evidence outside of the administrative record.

The "capsule definition" for the mental retardation listing states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05. "In addition to meeting this capsule definition, a claimant must also meet one of the four severity prongs for mental retardation as listed in the regulations." *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007). The four possible severity prongs are:

7

A. Mental incapacity evidenced by dependence upon others for personal needs . . . and inability to follow direction, such that the use of standardized measures of intellectual function is precluded; or
B. A valid verbal, performance, or full scale IQ of 59 or less;
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function; or
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
   1. Marked restriction of activities of daily living; or
   2. Marked difficulties in maintaining social functioning; or
   3. Marked difficulties in maintaining concentration, persistence, or pace; or
   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05.

The ALJ's findings on these severity levels include the following:

Turning back to listing 12.05, the requirements in "paragraph A" are not met because there is insufficient documentation that the claimant has a mental incapacity evidenced by dependence upon others for personal needs . . . and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. The "paragraph B" requirements are not met because the record does not evidence that the claimant has a *valid* verbal, performance, or full scale IQ of 59 or less. Finally, the "paragraph C" requirements are not met because the record does not evidence that the claimant has a *valid* verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. On the contrary, the record reveals that the claimant has strong adaptive functioning abilities in that he has worked for years, he completed the 10th grade (albeit in special education) and he has helped to take care of his children.

(R. 14) (italics in original). As to severity prong D, the ALJ found that,

"[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria [listing

8

12.02] ('paragraph D' criteria of listing 12.05) are not satisfied." (R. 13). Thus, the ALJ rejected severity prongs B and C due to the lack of valid IQ test results. Nor can the court find that the ALJ discussed whether Swindell met the capsule definition. Instead, the decision simply jumped to the severity prongs concluding that the claimant did not meet them due to the lack of valid IQ test results.

As quoted above, severity prongs B, C and D have an IQ score threshold. Consequently, "[s]tandardized intelligence test results are essential to the adjudication of all cases of mental retardation that are not covered under the provisions of 12.05A." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00D(6)(b). These testing results may "help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning." *Id.* at § 12.00D(6)(a). Because these results are "only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* "[T]he regulations specify the IQ test should be administered and interpreted by a psychologist or psychiatrist qualified by training and experience to perform such an evaluation." *McKown v. Shalala*, 5 F.3d 546, 1993 WL 335788 at *2 (10th Cir. 1993) (internal quotation marks and citations omitted).

For each of the ways defined in B, C and D, the threshold is defined as "a valid verbal, performance, or full scale IQ." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05. "[T]he ALJ may discount an IQ score as invalid for a variety of reasons," and this inquiry is not limited "to test results alone in isolation from other factors" such as "educational background and life activities." *McKown*, 1993 WL 335788 at *3; *see Lax v. Astrue*, 489 F.3d at 1087. If the ALJ discounts the validity of an IQ score, there must be "substantial evidence in the record to support his conclusion." *Id.*; *Lax v. Astrue*, 489 F.3d at 1089.

The only evidence of IQ test results and their validity comes from Dr. Cohen, the state agency psychological consultant. It is not clear if Dr. Cohen is summarizing another consultant's opinion or offering her own or both. Whatever the case, the test results and narrative report from which Dr. Cohen presumably makes her statement and/or opinion cannot be found in the administrative case record. Consequently, there is no evidence of record to support Dr. Cohen's statement and/or opinion or another consultant's opinion on the test results. "[T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record . . . ." Social Security Ruling 96–6p, Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at

10

the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence, 1996 WL 374180, at *2 (July 2, 1996). Without supporting evidence in the record, the ALJ's reliance on a consultant's opinion concerning the validity of the test results is improper.

**Consultative Examination and Duty to Develop Record**

Swindell's attorney asked at the hearing for the ALJ to order a consultative examination with WAIS-III testing to determine whether Swindell met the § 12.05 mental retardation listing. (R. 39-40). The ALJ said he would consider the request but also asked the claimant and his attorney to track down any IQ testing results taken during claimant's failed attempt to obtain a GED. (R. 40-41). The ALJ denied the request in his written decision:

> Lastly, at the hearing, the claimant's representative requested follow-up IQ testing for the claimant. The undersigned finds that this is not necessary because the claimant has functioned adaptively for years in that he completed the 10th grade, albeit in special education, he has the ability to obtain a commercial driver's license, hold jobs and help raise his children.

(R. 17).

Swindell argues the ALJ erred in not ordering a consultative examination with testing because the evidence of record presents a reasonable possibility of a severe mental impairment, because the examination would materially assist in resolving the impairment issue, and because his attorney identified this issue and requested this additional examination. While conceding the plaintiff had suggested a reasonable possibility of a severe

11

mental impairment, the Commissioner denies that the record shows such an examination to have been necessary or helpful in resolving the impairment issue. Instead, the Commissioner maintains the record contains sufficient medical evidence from which the ALJ could "make an informed decision regarding Plaintiff's intellectual functioning without ordering a consultative examination" and IQ testing. (Dk. 15, p. 6).

The court has previously outlined the considerations guiding a decision on this issue:

> Consultative medical examinations may be ordered by the ALJ when the information needed is not readily available from medical treatment sources. 20 C.F.R. §§ 404.1512(f), 404.1519a(a)(1). The Commissioner has broad latitude in ordering consultative examinations. Nevertheless, it is clear that, where there is a direct conflict in the medical evidence requiring resolution, or where the medical evidence in the record is inconclusive, a consultative examination is often required for proper resolution of a disability claim. Similarly, where additional tests are required to explain a diagnosis already contained in the record, resort to a consultative examination may be necessary. There must be present some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation. The claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists. When the claimant has satisfied this burden in that regard, it then becomes the responsibility of the ALJ to order a consultative examination if such an examination is necessary or helpful to resolve the issue of impairment. In a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development. In the absence of such a request by counsel, the court will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record. The ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability.

> *Hawkins v. Chater*, 113 F.3d 1162, 1166–1168, 1169 (10th Cir. 1997);
> *see Madrid v. Barnhart*, 447 F.3d 788, 791–792 (10th Cir. 2006)(where
> additional tests are required to explain a diagnosis already in the record,
> resort to a consultative examination may be necessary).

*Browning v. Astrue*, 2011 WL 5331685, at *10 (D. Kan. 2011).

There is no question but the record suggests the reasonable possibility of a severe mental impairment, as the state agency psychological consultant, Dr. Cohen, found the allegations of cognitive impairment to be credible with "moderate to marked limitation in ability to maintain concentration, persistence and pace." (R. 241). Dr. Cohen, noted that the consultative examination by Dr. Schemmel, judged Swindell "to fall in the borderline to mildly mentally retarded range" without performing any formal testing. (R. 209, 241). Dr. Cohen essentially agreed that Swindell likely fell within the "EMR range" (educable mentally retarded). (R. 241). From his mental status examination, Dr. Schemmel reported:

> Robert's attention span and concentration, per his digit recall (forward = 4; backward=3), were very poor. His short-term memory, based on his 3 of 3 on immediate recall and digit recall forward of only 4, was very poor. Robert's long-term memory, per his labored and poorly detailed social history, despite his 3 of 3 on delayed recall, appeared to be poor, as well. Robert's judgment, based on handling of hypothetical situations was very poor. He showed limited insight into his emotional functioning, and his intellect, based on his knowledge of Presidents (Obama to Clinton) and Continents (0 of 7) and his handling of Similarities items ("in what way are an eye and an ear alike?") was judged to fall in the borderline to mildly mentally retarded range. . . .
> Robert's performance on mental status tasks was suggestive of functional limitations due to cognitive deficits.
> . . . .
> . . . If returned to a work setting, Robert would likely encounter

13

regular interference from his cognitive deficits. As a result, he does not currently appear to possess the cognitive adaptability or persistence necessary for sustained gainful employment.

(R. 209-10).

The court also has noted above that "[s]tandardized intelligence test results are essential to the adjudication of all cases of mental retardation," 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00D(6)(b). These testing results may "help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning." *Id.* at § 12.00D(6)(a). By focusing exclusively on evidence of Swindell's adaptive functioning, the ALJ's decision states a different standard, that is, evidence of testing results are needed only when the record also evidences a lack of adaptive functioning. Such a standard does not mesh with these regulations, and potentially sets a higher bar than the material assistance test. There are opinions in the record supporting mental retardation, and Dr. Schemmel opined the need to "RULE-OUT Borderline Intellectual Functioning or Mild Mental Retardation" (R. 209). "[W]here additional tests are required to explain a diagnosis already in the record, . . . resort to a consultative examination may be necessary." *Madrid*, 447 F.3d at 791.

The court agrees with Swindell that the record is inconclusive on the extent of his mental retardation and whether it comes within the listed severity levels. The court is not persuaded that the evidence of Swindell's

14

adaptive functioning is such that the additional consultative examination and testing is unnecessary. Swindell dropped out of school while attending only special education classes. While incarcerated, Swindell was told that he had a "third grade education" and that his learning disability precluded getting a GED. (R. 151). Swindell did obtain a commercial driver's license, but as he explained, his girlfriend helped him in studying for it and the actual test was read to him. (R. 39).

Even considering Swindell's past employment history, the record is such that the consultative examination with testing results could reasonably be expected to assist materially in the evaluations at step three and subsequent steps. A past history of work does not necessarily mean the claimant cannot fulfill the listing requirements. "[S]omeone with mild mental retardation may manage to hold an unskilled job despite his or her intellectual limitation, but when faced with an additional impairment, be unable to work. . . . Listing 12.05C recognizes that someone with IQ scores within the range, and who suffers from a severe physical or other mental limitation, is disabled, irrespective of past work history." *Bradley v. Astrue*, 2012 WL 5878612, at *5 (D. Kan. 2012); *see McKown v. Shalala*, 5 F.3d 546, 1993 WL 3357 335788 (10th Cir. 1993)) (cited *Nieves v. Secretary of Health & Human Servs.*, 775 F. 2d 12, 14 (1st Cir. 1985) for "prior work as seamstress consistent with 'mild form of retardation' contemplated in 12. 05C.").

The Commissioner cites *Crane v. Astrue*, 369 Fed. Appx. 915, 921 (10th Cir. 2010), for the proposition that a claimant's work history of semi-skilled and skilled jobs excuses an ALJ from discussing the 12.05 listing. The Tenth Circuit in *Crane* found no evidence that the claimant even met the capsule definition for Listing 12.05 while noting that claimant's counsel never mentioned mental retardation. The panel then cited Crane's "GED and a steady work history" as additional reasons for the ALJ not even discussing the listing. 369 Fed. Appx. at 921. The holdings in *Crane* and the other decisions cited in the Commissioner's brief do not support the Commissioner's position that the claimant's work history here precludes the need for a consultant examination with testing.

The record does not contain substantial evidence to support the ALJ's reliance on Dr. Cohen's evaluation of the validity of Swindell's IQ testing results. The ALJ further erred in denying Swindell's request for an additional consultative examination with testing as the same would materially assist in determining whether Swindell suffers from a listed impairment.

IT IS THEREFORE ORDERED that the judgment of the Commissioner is reversed and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this memorandum and order.

Dated this 8th day of January, 2013, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge